**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 21-cv-02497-NYW-NRN

ALFREDO VILLOLDO, and
GUSTAVO E. VILLOLDO, individually, and as Administrator, Executor, and Personal
Representative of the Estate of Gustavo Villoldo Argilagos,

     Plaintiffs,

v.

THE REPUBLIC OF CUBA,

     Defendant.

---

## ORDER ON MOTION FOR DEFAULT JUDGMENT

---

This matter comes before the Court on Plaintiffs' Motion for Entry of Default Judgment (the "Motion" or "Motion for Default Judgment") [Doc. 33, filed June 30, 2022]. Upon review of the Motion, the record before the Court, and the applicable case law, the Motion for Default Judgment is **GRANTED in part** and **DENIED in part**.

### BACKGROUND

In this civil action, Plaintiffs Alfredo Villoldo and Gustavo E. Villoldo "seek the recognition, confirmation, and enforcement of a money judgment award rendered in their favor against" the Republic of Cuba ("Defendant" or "Cuba") entered in a Florida state court in 2021, effective *nunc pro tunc* August 22, 2011. [Doc. 1 at ¶ 1]. In their Complaint, Plaintiffs allege the following:[1]

---

[1] A defaulting party admits to the plaintiff's well-pleaded allegations of fact. *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1125 (10th Cir. 2003).

Plaintiffs are the sons of Gustavo Villoldo Argilagos ("Mr. Villoldo"), a United States citizen who resided in Cuba until his death in February 1959. [*Id.* at ¶ 4]. Plaintiffs allege that Cuba's "acts of terrorism and torture against Plaintiffs and their father, which started in January 1959 and continued through mid-2003, led to Mr. Vollildo's death on February 16, 1959, the confiscation of [Mr. Villoldo's] property, and extreme emotional distress to his family, including Plaintiffs." [*Id.* at ¶ 5].

In March 2011, Plaintiffs filed an amended complaint in Florida state court against Cuba, alleging economic loss, intentional infliction of emotional distress, and wrongful death of their father pursuant to the Foreign Sovereign Immunities Act ("FSIA"). [*Id.* at ¶ 6].[2] Plaintiffs allege that Defendant was served with process and translations thereof in accordance with FSIA requirements, but failed to answer or otherwise appear in the case. [*Id.*]. Default was entered against Defendant in state court on June 29, 2011. [*Id.*]. After Defendant was served with a notice of hearing with respect to Plaintiffs' motion for entry of a final judgment, a bench trial was held on August 19, 2011. [*Id.* at ¶¶ 6–7]. The Florida court entered a judgment on August 22, 2011, "setting forth detailed findings of fact and conclusions of law establishing Plaintiffs' entitlement to judgment against Defendant[]." [*Id.* at ¶ 7].[3]

Nearly ten years later, Plaintiffs moved to reopen the Florida case; this motion was served on Defendant. [*Id.* at ¶ 8]. The state court reopened the case on May 19, 2021 and received additional evidence with respect to its subject matter jurisdiction over Plaintiffs' claims. [*Id.*]. On

---

[2] Plaintiffs do not identify the specific claims they raised in state court and have not provided this Court with a copy of their state-court complaint.

[3] Plaintiffs represent that, in addition to naming Cuba as a defendant in the Florida action, they also sued four other individuals. [Doc. 1 at 3 n.1]. Thus, Plaintiffs sometimes refer to a plural "Defendants" in their Complaint. *See, e.g.*, [*id.* at ¶¶ 6, 7]. Because Cuba is the only named Defendant in this matter, the Court limits its discussion accordingly.

May 24, 2021, the Florida court entered a Second Amended Final Judgment, which reaffirmed the court's "prior findings on jurisdiction, liability and damages and incorporate[ed] additional findings confirming its subject matter jurisdiction over the Plaintiffs' claims." [*Id.* at ¶ 9]. The next day, the Florida court entered a Corrected Second Amended Final Judgment (the "state-court judgment") to correct a clerical error. [*Id.* at ¶¶ 10–11]; *see also* [Doc. 33-2].

On July 14, 2021, Defendant was served with a notice of the default judgment and the state-court judgment, alongside Spanish translations thereof. [Doc. 1 at ¶ 12]. They were served, pursuant to 28 U.S.C. § 1608(e) and 22 C.F.R. § 93.2, at the Cuban Ministry of Foreign Affairs in Havana, Cuba. [*Id.*].

Thereafter, on September 14, 2021, Plaintiffs initiated this civil action in the District of Colorado. *See generally* [*id.*]. They seek recognition, confirmation, and enforcement of the Florida state-court judgment pursuant to the Full Faith and Credit Clause in Article IV, Section 1 of the United States Constitution. [*Id.* at ¶ 15].[4] This case was originally assigned to the Honorable N. Reid Neureiter. [Doc. 2]. After the Parties declined to consent to the jurisdiction of a United States Magistrate Judge, *see* [Doc. 18], the case was reassigned to the Honorable Regina M. Rodriguez. [Doc. 20]. The case was reassigned to the undersigned on August 8, 2022 upon her appointment as a United States District Judge. [Doc. 34].

---

[4] As explained in more detail below, "[t]he Full Faith and Credit Clause is . . . not binding on federal courts." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986). "Rather, the extent to which a state court judgment is binding in a subsequent federal court action is governed by the full faith and credit act, codified at 28 U.S.C. § 1738." *Hannah v. Gen. Motors Corp.*, 969 F. Supp. 554, 559 (D. Ariz. 1996). "Generally, failure to set forth in the complaint a theory upon which the plaintiff could recover does not bar a plaintiff from pursuing a claim," *Elliott Indus. Ltd. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1121 (10th Cir. 2005), unless the "new theory prejudices the other party in maintaining its defense." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010). In the interest of judicial economy, and because the Court perceives no potential prejudice to Defendant, which has not appeared in this case, the Court construes Plaintiffs' claim as a claim simply seeking enforcement of the Florida state-court judgment under full-faith-and-credit principles.

Defendant failed to appear in this matter, which caused Plaintiffs to move for entry of default, *see* [Doc. 31], and default was entered on June 30, 2022. [Doc. 32]. That same day, Plaintiffs filed the instant Motion for Default Judgment. [Doc. 33]. On December 5, 2022, this Court entered a Minute Order identifying some concerns it had as to this Court's subject matter jurisdiction over this case. *See* [Doc. 36]. In the interest of judicial economy, *see* Fed. R. Civ. P. 1, the Court ordered Plaintiffs to file a supplemental brief addressing the Court's subject matter jurisdiction over this case. [*Id.* at 1]. Plaintiffs filed their thorough supplemental brief on January 9, 2023. [Doc. 37].

## LEGAL STANDARD

To obtain a judgment by default, a party must follow the two-step process set out in Rule 55. First, the party must seek an entry of default from the Clerk of the Court under Rule 55(a), which provides for the entry of default against any party who "has failed to plead or otherwise defend" against an affirmative request for relief. Fed. R. Civ. P. 55(a). Then, after the Clerk of Court has entered default, the party must move for default judgment under Rule 55(b).

"[T]he entry of a default judgment is committed to the sound discretion of the district court." *Tripodi v. Welch*, 810 F.3d 761, 764 (10th Cir. 2016). The first step in determining whether to enter default judgment requires the Court to resolve whether it has jurisdiction over the case, and if it does, whether the well-pleaded factual allegations in the Complaint and any attendant affidavits or exhibits support judgment on the claims against the defendant. *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010); *see also Magic Carpet Ski Lifts, Inc. v. S&A Co., Ltd*, No. 14-cv-02133-REB-KLM, 2015 WL 4237950, at *5 (D. Colo. 2015) ("There must be a sufficient basis in the pleadings for the judgment entered." (internal quotation marks omitted)). If the Court lacks

jurisdiction, either subject matter over the action or personal over the defendant, default judgment cannot enter.  *See Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011).

By its default, the defendant admits the plaintiff's well-pleaded allegations of fact, is precluded from challenging those facts by the judgment, and is barred from contesting on appeal the facts established.  *CrossFit, Inc. v. Jenkins*, 69 F. Supp. 3d 1088, 1093 (D. Colo. 2014); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages— is admitted if a responsive pleading is required and the allegation is not denied.").  The facts alleged in the Complaint which are deemed admitted upon default may form the basis for the Court's entry of a default judgment.  *See, e.g.*, *Salba Corp. v. X Factor Holdings, LLC*, No. 12-cv-01306-REB-KLM, 2015 WL 5676690, at *1 (D. Colo. 2015).  But a party in default does not admit conclusions of law, only allegations of fact, and so the factual allegations must be enough to establish substantive liability.  *Bixler*, 596 F.3d at 762; *Big O Tires, LLC v. C&S Tires, Inc.*, No. 16-cv-00725-MSK-NYW, 2017 WL 2263079, at *3 (D. Colo. May 24, 2017).

## ANALYSIS

The Full Faith and Credit Clause provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State," U.S. Const., art. IV, § 1, and is implemented and applied to federal courts through 28 U.S.C. § 1738.  *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 483 n. 24 (1982) ("Section 1738 was enacted to implement the Full Faith and Credit Clause, . . . and specifically to insure that federal courts, not included within the constitutional provision, would be bound by state judgments."); *Elliott*, 478 U.S. at 799.  The statute provides that

> [s]uch Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

28 U.S.C. § 1738. "[I]t is well settled that federal courts must give full faith and credit to the judgments of state and territorial courts." *Galahad v. Weinshienk*, 555 F. Supp. 1201, 1205 (D. Colo. 1983) (citing *Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183 (1941) and *Davis v. Davis*, 305 U.S. 32 (1938)). "A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 223 (1998).

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 80 (1984). However, "a judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment." *Underwriters Nat'l Assurance Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982).

Section 1738 "commands a federal court to accept the rules chosen by the State from which the judgment is taken." *Kremer*, 456 U.S. at 482. "Florida law, like federal law, calls for a de novo examination of the Florida state court's jurisdiction: 'A judgment entered by a court which lacks subject matter jurisdiction is void and subject to collateral attack under [Florida] rule 1.540 at any time.'" *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014) (quoting *McGhee v. Biggs*, 974 So.2d 524, 526 (Fla. Dist. Ct. App. 2008) (alteration in original). Indeed, "[a] default judgment rendered in excess of a court's jurisdiction is void." *Id.* at 422. Because "a state court judgment is not entitled to full faith and credit if the state court did not have jurisdiction to enter the judgment," this Court is obligated to independently analyze whether the Florida state court had subject matter jurisdiction over Plaintiffs' claims. *Sullivan v. Republic of Cuba*, 289 F. Supp. 3d

231, 242 (D. Me. 2017), *aff'd*, 891 F.3d 6 (1st Cir. 2018).  Relatedly, this Court has an independent

duty to confirm its own subject matter jurisdiction *sua sponte*.  *City of Albuquerque v. Soto Enters.,*

*Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017).

## I.     Subject Matter Jurisdiction

28 U.S.C. § 1330 provides that:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state *is not entitled to immunity* either under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a) (emphasis added).  "Section 1330 is the basis for a federal court's jurisdiction

over a foreign sovereign even when the court is being asked to enforce a state court judgment

because 'an attempt to obtain a federal judgment on the strength of a state court judgment is not a

case arising under the Constitution, laws, or treaties of the United States that would trigger federal

question jurisdiction.'"  *Sullivan*, 289 F. Supp. 3d at 242 (quoting *Vera v. Republic of Cuba*, 867

F.3d 310, 320 (2d Cir. 2017) ("*Vera I*")).[5]

Here, Plaintiffs (1) do not demand a jury trial; (2) assert a civil cause of action; and

(3) assert a right to in personam relief against the Republic of Cuba, a foreign state.  [Doc. 1 at 5].

That leaves only the question of Cuba's sovereign immunity.

---

[5] Plaintiffs also maintain that this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  [Doc. 1 at ¶ 2; Doc. 33 at 16].  But "the Full Faith and Credit Clause, in either its constitutional or statutory incarnations, does not give rise to an implied federal cause of action." *Thompson v. Thompson*, 484 U.S. 174, 182 (1988).  "Thus, an attempt to obtain a federal judgment based on the strength of a state court judgment is not a case arising under the Constitution, laws, or treaties of the United States that would trigger federal question jurisdiction." *Vera I*, 867 F.3d at 320.  "If it were otherwise, 'any attempt, at any time or place, by any person, to enforce the provisions of any state statute or judgment would be, without more, a subject of federal jurisdiction.'" *Id.* (quoting *California ex rel. McColgan v. Bruce*, 129 F.2d 421, 424 (9th Cir. 1942)).

### A.   The Foreign Sovereign Immunities Act

"The Foreign Sovereign Immunities Act governs the jurisdiction of courts in the United States over all private civil actions against foreign sovereigns." *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 132 (2d Cir. 2019) ("*Vera II*") (citation omitted).  The statute declares that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  "If one of the enumerated exceptions applies, the foreign state is liable, in state or federal court, 'in the same manner and to the same extent as a private individual under like circumstances.'"  *Vera I*, 867 F.3d at 316 (quoting 28 U.S.C. § 1606).  "Section 1330 thus 'works in tandem' with the FSIA's substantive provisions: Section 1604 bars state and federal courts from exercising jurisdiction when a foreign state is entitled to immunity, and section 1330 confers jurisdiction on federal district courts only if one of the exceptions to immunity applies."  *Id.* (alteration marks omitted).  In this case, Plaintiffs argue that an FSIA exception applies and, for this reason, Cuba is not immune from suit.  *See* [Doc. 1 at ¶ 6; Doc. 33 at 4].

"If no [FSIA] exception applies, no [state or federal] court has jurisdiction to hear the claim."  *Vera I*, 867 F.3d at 316.  Thus, to give full faith and credit to the state court's judgment, the Court must assess whether that court properly exercised subject matter jurisdiction over Plaintiffs' claims by determining whether an FSIA exception applies in this case.  *Jerez*, 775 F.3d at 423; *Sullivan*, 289 F. Supp. 3d at 242 ("[W]hen asked to enforce a state court judgment against a foreign sovereign based on the terrorism exception to foreign sovereign immunity, a federal court must examine whether the claim actually falls within that exception.").  And under § 1330, this Court's subject matter jurisdiction too turns on whether Cuba is entitled to immunity under the FSIA.  28 U.S.C. § 1330(a).  Thus, this Court's assessment of its own subject matter jurisdiction

and the Florida court's subject matter jurisdiction go hand-in-hand; in either assessment, there is no subject matter jurisdiction unless Plaintiffs establish that an exception to the FSIA's grant of sovereign immunity applies in this case.

"The Court 'begins with a presumption of immunity' for foreign states, and U.S. courts lack subject matter jurisdiction over claims against foreign states unless certain exceptions under the FSIA apply." *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 120 (D.D.C. 2019) (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)). In conducting its jurisdictional analysis, the Court "is not bound by the judgment court's determination of jurisdiction." *Sullivan*, 289 F. Supp. 3d at 242; *see also Jerez*, 775 F.3d at 423 (collecting cases and applying Florida law); *Vera I*, 867 F.3d at 318. Indeed, while "principles of res judicata apply to jurisdictional determinations—both subject matter and personal," *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982), "a finding of jurisdiction is preclusive only when the jurisdictional issues 'have been fully and fairly litigated . . . in the court which rendered the original judgment.'" *Vera II*, 946 F.3d at 135–36 (quoting *Durfee v. Duke*, 375 U.S. 106, 111 (1963)). Because Cuba failed to appear in the Florida state-court action, the Florida court's jurisdictional conclusions "neither bind [this Court] . . . not can they be relied on by the parties." *Vera I*, 867 F.3d at 318.

### B.   Plaintiffs' Burden

"[A]n attempt to seek a default judgment in an action involving a foreign sovereign triggers a special duty on the part of a federal court to carefully scrutinize the plaintiff's claim." *Sullivan*, 289 F. Supp. 3d at 242. When a federal court is asked "to enforce a state court judgment

against a foreign sovereign based on the terrorism exception to foreign sovereign immunity," the court "must examine whether the claim actually falls within that exception." *Id.*

In cases arising under the FSIA, "the Court may 'accept as true the plaintiff's uncontroverted evidence.'" *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 38 (D.D.C. 2019). Courts have recognized an "obligation" to adjust evidentiary requirements to "differing situations." *Id.*; *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014) ("[C]ommon experience tells us that where a plaintiff has produced compelling, admissible evidence that the regime abducted the victim and that it routinely tortures and kills the people it abducts, the courts can assume that the defendant probably tortured and killed the victim." (quotation marks omitted)). "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Frost*, 383 F. Supp. 3d at 38. "While the 'FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted the FSIA's terrorism exception and Section 1608(e) "with the 'aim to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.'" *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016) (quoting *Kim*, 774 F.3d at 1047–48).

### C. The FSIA's Terrorism Exception

Plaintiffs proceeded in Florida state court under the "terrorism exception" to the FSIA. *See* [Doc. 1 at ¶ 6; Doc. 33 at 4]. The FSIA provides that

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage

taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The terrorism exception can be broken out into four concrete elements: first, the foreign state must have been designated as a state sponsor of terrorism at the time the challenged acts occurred, or was so designated as a result of such acts; second, the claimant or victim must have been, at the time the challenged acts occurred, a national of the United States; third, if the challenged acts occurred in the foreign state against which the action is brought, the claimant must have afforded the foreign state a reasonable opportunity to arbitrate the claim; and fourth, the plaintiff must seek monetary damages for injuries or death caused by torture, an extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for one of these acts.  *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 44 (D.D.C. 2018).  The Court addresses each element below.

### 1.    State Sponsor of Terrorism

The United States designated Cuba as a state sponsor of terrorism in 1982.  *See, e.g.*, [Doc. 33-7 at ¶ 2].[6]  Plaintiffs argue that this designation was made "as the result of" the acts challenged in this case—i.e., the "long-running abuses of U.S. citizens like Plaintiffs"—as required by the FSIA.  *See* [Doc. 33 at 7–10]; 28 U.S.C. § 1605(a)(2)(A)(i)(I).

Relevant here, Plaintiffs have unsuccessfully made this same argument in prior litigation. *See, e.g.*, *Vera II*, 946 F.3d at 127–28, 137–42.  In *Vera II*, the Second Circuit concluded that the record failed to specifically link Cuba's designation as a state sponsor of terrorism to Plaintiffs' claims for damages.  *Id.* at 137–43.  The Second Circuit relied on a Statement of Interest from the

---

[6] Cuba has since been removed from the United States' list of state sponsors of terrorism.  *See* *Sullivan*, 289 F. Supp. 3d at 240 n.9.

United States Department of State (the "State Department") setting forth its formal position related

to the "[r]eason or reasons Cuba was designated a state sponsor of terrorism under Section 6(j) of

the Export Administration Act of 1979," as well as related testimony. *Id.* at 138. The Second

Circuit described the Statement of Interest as follows:

> The submission . . . consisted of an affidavit by Peter M. Brennan, an experienced diplomat who was then in charge of the [State] Department's Office of the Coordinator for Cuban Affairs. Brennan averred that, in 1982, when it was so designated, "Cuba belonged in the category of states that have repeatedly provided support for . . . organizations and groups abroad that used terrorism and revolutionary violence as a policy instrument to undermine existing governments." This support was the reason for its designation, he implied. In support of this understanding, Brennan's affidavit cited contemporaneous Congressional testimony given by two State Department officials: (1) the March 12, 1982 testimony of Thomas Enders, Assistant Secretary of State for Inter-American Affairs, before the Subcommittee on Security and Terrorism of the Senate Judiciary Committee; and (2) the March 18, 1982 testimony of Ernest Johnson, Jr., Deputy Assistant Secretary for Economic Affairs, before a subcommittee of the Senate Foreign Relations Committee.
>
> Enders, in his testimony before the Senate Subcommittee on Security and Terrorism, provided an extensive catalogue of Cuban support given to insurgent groups in other Latin American countries, including Nicaragua, El Salvador, Guatemala, Honduras, Costa Rica, Colombia, and Chile. Enders specifically referenced Cuba's implementation in 1978 of a "new strategy . . . of uniting the left in the countries of the hemisphere for the purpose of using it . . . [to establish] more Marxist-Leninist regimes in this hemisphere" as standing in contrast to the country's previous attempts to "portray itself as a member of the international community not unlike others, carrying out state-to-state relations through embassies and emphasizing trade and cultural contacts." Enders portrayed the members of the Cuban leadership group as subject to a "deep-seated drive to re-create their own guerrilla experience elsewhere," observing that "the Castro regime has made a business of violent revolution."
>
> Johnson's brief testimony echoed Enders's remarks. He again tied Cuba's 1982 designation to its support of armed groups outside its borders. He expressed the "hope that . . . the addition of Cuba to the list will demonstrate to other countries . . . that our export controls are truly directed towards terrorism. In the case of Cuba, we evaluated carefully the evidence of Cuban support for revolutionary violence and groups that use terrorism as a policy instrument."

*Id.* at 138–39 (citations and footnote omitted and alteration marks changed).

The Second Circuit then went on to state that "[b]ecause the decision to designate a state as a sponsor of terrorism is committed by statute to the discretion of the Secretary of State, we often regard such official pronouncements as authoritative." *Id.* at 142. The court concluded that Plaintiffs had not established the requisite link between the designation and the challenged acts, and as a result, concluded that the district court lacked jurisdiction over the case. *Id.* at 142–43; *cf. Vera I*, 867 F.3d at 319 (concluding, based on this same evidence, that there was no evidence tying Cuba's terrorist designation to the plaintiff's father's death because the legislative materials and statements by government officials submitted in this case ma[de] no mention of extrajudicial killings or of the death of [the plaintiff's] father.").

Plaintiffs represent that, as a result of the Second Circuit's decision, they "sought and obtained extensive evidence as to the reasons why the United States designated the Republic of Cuba as a state sponsor of terrorism in 1982." [Doc. 33 at 7]. This evidence includes (1) a declaration from Davis Rowland Robinson, who was "the chief lawyer at the U.S. State Department at the time of the designation" and who was "personally involved in the decision to designate Cuba a state sponsor of terrorism," [*id.* at 8; Doc. 33-7]; (2) two declarations from Professors Jaime Suchlicki and Jorge Salazar-Carrillo, [Doc. 33-8; Doc. 33-9];[7] and (3) a declaration from Frank Calzon, the former Executive Director of the Center for a Free Cuba, who

---

[7] Professor Suchlicki is the Emilio Bacardi Moreau Distinguished Professor Emeritus and former Director of the Institute for Cuban and Cuban-American Studies at the University of Miami and is a "recognized expert on the conduct and policy of the Castro Regime and the government of the Republic of Cuba since the revolution began in the late 1950[s]." [Doc. 33-8 at ¶ 1]. Professor Salazar-Carrillo, who lived in Cuba until 1960 and previously worked for the Cuban government, is a member of the Cuban Research Institute in the School of International and Public Affairs at Florida International University and is involved in a number of organizations and associations related to the study of Cuba. [Doc. 33-9 at ¶¶ 1–8]. Professor Salazar-Carrillo represents that he "personally witnessed the total expropriation of [the Villoldo family's] assets" from a governmental level and the very grave consequences it brought about." [*Id.* at ¶ 9].

"ha[s] spent [his] professional career following the developments in Cuba since the Cuban revolution in 1959." [Doc. 33-10 at ¶¶ 1, 6]. Plaintiffs argue that these declarations, "supported by historical evidence and the declarants' personal knowledge, expertise, and decades of relevant experience, provide more than sufficient evidence to support the jurisdictional finding that the Second Circuit perceived was lacking." [Doc. 33 at 10].

The Court has reviewed each of the declarations provided by Plaintiffs and will recount their most pertinent statements herein. Mr. Robinson avers that he served as the Legal Advisor for the State Department from July 30, 1981 through May 1, 1985 and "served in this role before, during, and after the State Department deliberations over whether and when to designate the Republic of Cuba a state sponsor of terrorism." [Doc. 33-7 at ¶ 2]. Mr. Robinson was personally involved in those deliberations. [*Id.*]. According to Mr. Robinson, Mr. Brennan's previously referenced declaration explaining the reasoning behind Cuba's designation is "not completely correct," as it does not address (or purport to address) all of the reasons why the United States designated Cuba a state sponsor of terrorism. [*Id.* at ¶ 4]. He explains that the State Department's decision to designate Cuba included "the Cuban government's acts of domestic and international terrorism dating back several decades, such as its well-known domestic human rights abuses by torturing and killing its citizens and confiscating their assets, particularly by targeting wealthy Cuban citizens with ties to the United States." [*Id.*]. He avers that the conduct against the Plaintiffs and their family at issue in this case "is an example of the type of conduct by the Cuban government that we in the State Department sought to punish and deter by designating Cuba a state sponsor of terrorism in 1982." [*Id.* at ¶ 8].

Similarly, the other declarants agree that "nothing in the historical record supports the idea that Cuba was designated as a state sponsor of terrorism solely because of its exportation of

revolution abroad."  [Doc. 33-9 at ¶ 11].  It is Professor Salazar-Carrillo's opinion, based on his personal knowledge and the historical record, "that the acts against the Villoldo family were known to the U.S. government and were part of the acts of the Cuban government that were . . . considered in part in making the decision to designate Cuba a state sponsor of terrorism[] in 1982."  [*Id.* at ¶ 12].  And Professor Suchlicki avers that it is her opinion that "among the many reasons for the U.S. government's 1982 designation of Cuba as a state sponsor of terrorism were the Castro regime's violations of human rights, including extrajudicial killings, torture, and the confiscation of Cuban and U.S. properties in the island, as well as[] other actions that threatened the interests and security of the U.S."  [Doc. 33-8 at ¶ 8].  Finally, Mr. Calzon has described the geopolitical climate surrounding Cuba and the United States in the years leading up to Cuba's designation, including the Reagan administration's position that "Cuba's leaders [must be held] accountable for their conduct in foreign policy, economic management, and human rights."  [Doc. 33-10 at ¶¶ 6–13].

"The party seeking to establish jurisdiction [over a foreign state] bears the burden of producing evidence establishing that a specific exception to immunity applies."  *City of New York v. Permanent Mission of India to the United Nations*, 446 F.3d 365, 369 (2d Cir. 2006).  There is minimal case law describing what type of showing is required to demonstrate that a country was designated as a state sponsor of terrorism "as a result of" certain actions.  Notably, courts within the District Court for the District of Columbia—the venue in which the overwhelming majority of FSIA cases are filed—have "held that 'as a result' in this context means wholly or *in part* as a result."  *Doe*, 414 F. Supp. 3d at 123–24 (emphasis in original).  The Court concurs with this approach.  The FISA requires that the designation be "*a* result of" the challenged acts, as opposed to "*the* result of" the challenged acts.  *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I) (emphasis added).

15

The Court concludes that, based on the plain language of the statute, the challenged acts need not be the sole or only reason for the designation, but must be *a* cause of the designation. *See also Warmbier*, 356 F. Supp. 3d at 44–45 ("Here, the State Department's designation of North Korea as a state sponsor of terrorism was, *at least in part*, a result of North Korea's detention and mistreatment of Otto, which is sufficient to meet the state-sponsor-of-terrorism requirement." (emphasis added)); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 65 (D.D.C. 2010) ("Iran was so designated by the Secretary of State *in partial response* to the Beirut bombing. . . . The requirements of § 1605A(a)(2)(A)(i) are therefore satisfied.") (emphasis added).

Here, Plaintiffs have submitted a declaration from a government official who was personally involved in the decision to designate Cuba as a state sponsor of terrorism and who states that the conduct at issue in this case is an example of conduct that was part of the reason that the United States decided to designate Cuba as a state sponsor of terrorism in 1982. In addition, they have presented the opinions of experts in Cuban history, who have provided additional context to the relations between Cuba and the United States; the conduct of Cuban officials that informed the decision-making of the United States; and the Villaldo family as part of Cuban society both before and after the Revolution. Mindful that a lenient evidentiary standard is appropriate in FSIA terrorism cases, where "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign," *Frost*, 383 F. Supp. 3d at 38, and because Plaintiffs must only establish that the challenged conduct was *a* cause of the designation, the Court concludes that Plaintiffs have presented evidence that is satisfactory to the Court under § 1608(e). And because Cuba has not presented "any evidence in rebuttal, th[e] [FSIA terrorism exception's] first element is met." *Doe*, 414 F. Supp. 3d at 124 (quotation omitted).

### 2.      Plaintiffs Are U.S. Nationals

Mr. Villoldo was a United States citizen and Plaintiffs are United States citizens.  *See* [Doc. 33-2 at 4; Doc. 33-15 at ¶¶ 7–9; Doc. 33-14 at ¶¶ 9–12]; 8 U.S.C. § 1401(h).  Plaintiffs have thus satisfied the second element of the FSIA terrorism exception.  *See Warmbier*, 356 F. Supp. 3d at 45.

### 3.      Plaintiffs Offered Cuba an Opportunity to Arbitrate

Next, Plaintiffs must establish that they provided Cuba with the opportunity to arbitrate their claims.  *Id.* at 45–46.  The FSIA "does not require any particular form of offer to arbitrate, simply the extension of a 'reasonable opportunity.'"  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003).  Plaintiffs have submitted evidence that on January 21, 2011, they submitted an offer to arbitrate to Defendant specifically invoking § 1605(a)(2)(A)(iii) and accompanied by a Spanish translation.  *See* [Doc. 33-16].  This third element is therefore satisfied.  *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 135 (D.D.C. 2021) (finding third element satisfied where the plaintiffs "included an Offer to Arbitrate, as well as a translation of that letter into Arabic, with their summons and complaint").

### 4.      Defendant's Acts

Finally, Plaintiffs must provide evidence establishing that their damages arise from one of the acts enumerated in § 1605A(a)(1).  Plaintiffs argue that their damages arise out of (1) acts of torture and (2) an extrajudicial killing, relying on the Florida state court's conclusion that Defendant's actions fit within the statutory definitions of these terms.  [Doc. 33 at 17]; *see also* [Doc. 37 at 7–40].

*Acts of Torture*.  The FSIA incorporates the definition of "torture" from the Torture Victim Protection Act of 1991 ("TVPA").  *See* 28 U.S.C. § 1605A(h)(7).  The TVPA provides:

(1) The term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Torture Victim Protection Act of 1991, Pub. L.No. 102-256, 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350 note, § (3)(b)(1). "To establish torture, the plaintiffs must show that the conduct was sufficiently severe and purposeful." *Warmbier*, 356 F. Supp. 3d at 46. "[S]uffering alone is insufficient to establish a claim under the FSIA's terrorism exception. To qualify as torture, the mistreatment must be purposeful—that is, the defendant must have targeted the victim, for instance, to punish him for his religious or political beliefs." *Kim*, 774 F.3d at 1050. In addition, "[i]n order to lose its sovereign immunity, a foreign state must impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002)).

Plaintiffs argue that they "presented competent evidence to the Florida court to support" its conclusion that Cuba engaged in acts of torture, noting that "the [Florida] court specifically found that Cuba committed heinous acts of torture and extrajudicial killing committed against the Villoldos in over ten pages of findings of fact." [Doc. 33 at 17]. But as mentioned above, the Florida court's jurisdictional conclusions are not binding on this Court. *Vera I*, 867 F.3d at 318. In its Minute Order, the Court highlighted the definition's requirement that for an act to amount to "torture," it must be committed against an individual "in the offender's custody or physical control." *See* [Doc. 36 at 1 n.1]. "The FSIA requires . . . that the plaintiff be 'in the offender's custody or physical control' at the time the 'severe pain or suffering' is inflicted." *Mohammadi v.*

*Islamic Republic of Iran*, 947 F. Supp. 2d 48, 67 (D.D.C. 2013), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015) (citing 28 U.S.C. § 1350 note § 3(b)(1) and 28 U.S.C. § 1605A(h)(7)). "A sovereign cannot be found to have committed torture unless it had custody or physical control over the victim." *Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708 (GMH), 2019 WL 1787615, at *9 (D.D.C. Apr. 24, 2019), *aff'd*, 6 F.4th 1338 (D.C. Cir. 2021). "The plain language of the statute contemplates only *physical*, as opposed to constructive or psychological, custody or control." *Mohammadi*, 947 F. Supp. 2d at 68 (emphasis in original). "Custody or physical control" can arise out of, for example, a kidnapping or imprisonment. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010).

Plaintiffs argue that "Cuba waived its jurisdictional immunity when it falsely imprisoned and tortured Gustavo and Alfredo Villoldo in January 1959 and repeatedly attempted to assassinate Gustavo Villoldo between 1982 and 2003." [Doc. 37 at 14 (citations omitted)]. The Court focuses first on the 1959 imprisonment. Plaintiffs argue that the evidence in this case "demonstrates that Cuba inflicted 'severe pain or suffering' on Gustavo and Alfredo Villoldo while they were detained and physically and mentally abused at the Sports Palace in January 1959." [*Id.* at 19].

The evidence demonstrates that, in January 1959, Gustavo received a telephone call from Alfredo during which Alfredo relayed that there was a "group of barbudos"[8] at his home threatening his life and trying to arrest him. [Doc. 33-13 at 41:24–42:5].[9] When Gustavo arrived at Alfredo's home, it was surrounded by two or three jeeps and 15 or 16 barbudos with automatic weapons and rifles. [*Id.* at 42:6–11]. The barbudos arrested Gustavo. [*Id.* at 43:14–15]. Gustavo

---

[8] The term "barbudos," as used by Plaintiffs and by the Court in this Order, refers to soldiers who were "loyal to the Castro regime." [Doc. 33-15 at ¶ 15].

[9] When citing to transcripts, the Court cites to the page and line numbers generated by the transcript, rather than the page number generated by the CM/ECF system.

was detained in the "Sports Palace" for four to five days; he was confined in a small area with about 100 other prisoners, received very little food, was forced to strip naked, was not permitted to sleep, and was denied proper bathroom facilities. [*Id.* at 43:22–44:20]. He was beaten with a sock full of sand, [*id.* at 46:8–10], and was suffocated with a wet towel. [*Id.* at 46:23–24]. During his detainment, he was interrogated several times and was told his father, mother, and brother would be killed and that he would be sent to La Cabaña to be executed.[10] [*Id.* at 44:21–45:8]. During his imprisonment, approximately 20 people per day were "transported for execution." [Doc. 33-15 at ¶ 20]. And finally, Gustavo was told that he was imprisoned for being a "Yankee imperialist" and a "counter-revolutionary" and was accused of being an American agent. [*Id.* at ¶ 17; Doc. 33-13 at 43:4–5, 45:9–10].

The Court agrees with Plaintiffs that they have produced sufficient evidence to establish that Gustavo's damages arise from personal injuries resulting from acts of torture. First, the evidence shows that Defendant intentionally inflicted severe pain and suffering on Gustavo while he was imprisoned. This case is analogous to *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000), wherein one plaintiff alleged that he had been confined for 11 days "with no water, no toilet and no bed." *Daliberti*, 97 F. Supp. 2d at 45. Another alleged that he was held for "at least four days" with "no water, no toilet, and no proper bed." *Id.* The court concluded that "[s]uch direct attacks on a person and the described deprivation of basic human necessities are more than enough to meet the definition of 'torture' in the Torture Victim Protection Act and thus to give rise to a claim under the state sponsored terrorism exception to foreign sovereign immunity." *Id.*; *see*

---

[10] Gustavo testified that La Cabaña is "where the majority of political prisoners who were going to be executed were sent to." [Doc. 33-13 at 45:16–18].

*also Sotloff*, 525 F. Supp. 3d at 137 ("[I]nfliction of starvation, unsanitary conditions, severe pain, and threats of execution . . . are severe enough to qualify as torture under the TVPA.").

Additionally, the Court is satisfied that Plaintiffs have submitted adequate evidence to demonstrate that the severe pain and suffering was inflicted for purposes of punishment, coercion, or discrimination.  The record demonstrates that Mr. Villoldo held "economic and political influence" in Cuba, was "close to" members of the U.S. and Cuban governments, and personally knew Cuban President Fulgencio Batista.  [Doc. 33-13 at 34:21–35:2, 35:17–22].  In the state court proceedings, Plaintiffs offered testimony from Juan O. Tamayo, an associate researcher with the Center for Cuban and Cuban-American studies, who testified that once Fidel Castro assumed power, the Cuban revolutionary government targeted "virtually anyone that had any sort of connections to the Batista government or the Batista security forces," as well as "virtually anyone who was on the sort of high levels of Cuban business, government, security forces, diplomatic[,] [or] sort of well-known people." [Doc. 37-3 at 10:14–17, 20:2–6, 28:21–29:8]; *see also Warmbier*, 356 F. Supp. 3d at 47 ("[R]eliance on expert testimony is sufficient and appropriate.").  And finally, Plaintiffs have submitted evidence that Gustavo was detained because he was believed to be a "Yankee imperialist," [Doc. 33-13 at 43:3–5], and that he was "continuously told that [his] family was going to be killed unless [he] admitted to being an American agent. " [Doc. 33-15 at ¶ 20].  Accordingly, Plaintiffs have established that Gustavo was subjected to acts of torture as defined by the TVPA and contemplated by the FSIA.[11]

---

[11] Because the Court has concluded that Plaintiffs have established that Gustavo's 1959 detention meets the TVPA's definition of torture, it need not and does not reach Plaintiffs' arguments with respect to Defendant's "repeated[] attempt[s] [to] assassinate Gustavo Villoldo between 1982 and 2003." [Doc. 37 at 14].

Whether the evidence establishes the same with respect to Alfredo is less clear.  Though Plaintiffs consistently refer to Plaintiffs collectively, or suggest that evidence demonstrates that the brothers were treated in the same manner while imprisoned, *see, e.g.*, [Doc. 37 at 17 ("The *barbudos* physically and psychologically abused Gustavo and Alfredo Villoldo.  After being unlawfully detained, the Villoldo brothers were held at the Sports Palace alongside other political prisoners in horrendous conditions for several days."); *id.* at 18 ("In addition to being held in horrendous conditions, Gustavo and Alfredo were severely physically and mentally abused.")], the evidence Plaintiffs rely on in support largely relates only to Gustavo's imprisonment, not Alfredo's.  *See, e.g.*, [*id.* at 17–18].  While the evidentiary standards at this juncture may be lenient, Plaintiffs must produce at least some competent evidence demonstrating that Alfredo *himself* was subjected to acts of torture by Defendant.

The evidence establishes that Alfredo was also taken to the Sports Palace "for two or three days" and was "held in communicado and . . . was released before [Gustavo] was released."  [Doc. 33-13 at 68:15–20].  Alfredo testified that he was interrogated and "all the time they were telling [him] that they were going to kill [Alfredo and his family]."  [Doc. 37-3 at 115:10–13].  Alfredo believed these threats.  [*Id.* at 116:11–18].  He was asked questions about his father and his "connection with the American people" and asked whether his father was part of the American government.  [*Id.* at 115:13–15, 20–23].  Alfredo testified that he was not questioned "for the whole time"; instead, they "put [him] in a room for questioning, then they took [him] to another room for a while, back and forth."  [*Id.* at 116:6–10].  When asked if Alfredo was beaten during his imprisonment, Gustavo responded: "He – he was – he was put through a rough moment there." [Doc. 33-13 at 68:21–23].

Plaintiffs have not directed the Court to any case law where courts have concluded that similar circumstances amounted to "acts of torture" as defined in the TVPA. *See* [Doc. 37 at 16–19]. While the Court finds the above evidence to demonstrate that Alfredo was in Cuba's custody or control, the Court cannot conclude that the evidence demonstrates that he was the victim of acts "by which severe pain or suffering whether physical or mental[] [were] intentionally inflicted." 28 U.S.C. § 1350 note, § 3(b)(1).

To determine whether acts amount to "torture" under the TVPA, the District of Columbia Circuit "uses two measures: (1) 'the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim'; and (2) the extent to which the 'production of pain and suffering is purposive.'" *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 129 (D.D.C. 2019) (quoting *Price*, 294 F.3d at 93). With respect to the first prong, acts of torture must be "sufficiently extreme and outrageous to warrant . . . universal condemnation," e.g., "sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or handing in positions that cause extreme pain." *Price*, 294 F.3d at 92–93. "The more intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.* at 93. "[T]orture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Id.*

Here, the evidence establishes that Alfredo was in custody for two to three days, was intermittently questioned (at unknown intervals and for unknown lengths of time) about his family's connection to America, and was threatened that his family would be killed. While disturbing, the Court is unable to conclude that Plaintiffs have submitted evidence demonstrating that the treatment of Alfredo while in custody amounted to "extreme, deliberate and unusually cruel practices." *Id.* at 93–94. Plaintiffs do not direct the Court to any evidence that Alfredo was

physically beaten or tortured during his interrogation.  *Compare Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 151 (D.D.C. 2017) (finding acts of torture where an interrogator chained the plaintiff to a table and whipped the plaintiff, and on other occasions, handcuffed the plaintiff in "stress positions for hours at a time").  Nor is there any evidence detailing Alfredo's conditions of confinement, so as to determine whether he was placed in conditions so inhumane that they would amount to torture.  *Compare Azadeh v. Gov't of Islamic Republic of Iran*, No. 1:16-cv-1467 (KBJ), 2018 WL 4232913, at *11 (D.D.C. Sept. 5, 2018) (finding acts of torture where the plaintiff was "confined to a small cell lacking adequate light and toilet facilities, and was left with nothing on which to sleep except an insect-infested rug" and was subject to daily "lengthy interrogations" for six weeks).

To be sure, the Court does not hold that acts causing physical pain or discomfort are necessary to demonstrate that a person was subjected to acts of torture.  "Acts of torture" also include acts causing mental pain or suffering, which is defined in the TVPA as

prolonged mental harm caused by or resulting from–

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350, note § 3(b)(3); *see also Abedini*, 422 F. Supp. 3d at 129 (stating that the definition of mental suffering "encompasses 'prolonged mental harm' caused by threats of

immediate bodily injury, death threats, and threats against family members.").  But Plaintiffs have directed the Court to no case law establishing that the threats against Alfredo's family members are sufficient to amount to "acts of torture," and absent any evidence demonstrating the nature or frequency of the threats, the Court is unable to conclude that there is sufficient evidence of "*prolonged* mental harm" caused by such threats.  *See Simpson*, 326 F.3d at 234 (concluding that the plaintiff's allegations that she was "interrogated and then held incommunicado," "threatened with death," and "forcibly separated from her husband" without knowledge of his welfare or whereabouts "reflect[ed] a bent toward cruelty on the part of the[] perpetrators" but were "not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the Act."); *Radmanesh*, 2019 WL 1787615, at *10 ("Though the Basaji may have harassed and abused Plaintiff under color of law, such treatment is simply not sufficiently extreme and outrageous to meet the 'rigorous definition of torture' in the FSIA.").

Accordingly, while the Court concludes that Plaintiffs have established evidence of this last requisite of subject matter jurisdiction under the FSIA as to Gustavo, they have not done the same with respect to Alfredo.

***Extrajudicial Killing***.  In the alternative, Plaintiffs suggest that Mr. Villoldos's death was the result of an extrajudicial killing by Cuba, and for this reason, the damages they seek fall within the terrorism exception of the FSIA.  [Doc. 33 at 17; Doc. 37 at 27–35]; *see also* [Doc. 33-2 at 27 (the Florida court referencing "the extra-judicial killing of Gustavo Villoldo Argilagos")].  As with the definition of "torture," the FSIA adopts the TVPA's definition of "extrajudicial killing."  28 U.S.C. § 1605A(h)(7).  The TVPA defines "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  28. U.S.C. § 1350

note, § 3(a).  This definition is comprised of three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Warmbier*, 356 F. Supp. 3d at 52.

Plaintiffs assert that Cuban agents "ordered Mr. Villoldo . . . to commit suicide or face the murder of his family members" and that Mr. Villoldo "ended his life under duress from the revolutionary government."  [Doc. 33 at 2].  The record evidence demonstrates that throughout January and February 1959, the Villoldo family was targeted by Che Guevara and the Cuban revolutionary government.  [Doc. 33-15 at ¶ 23].  On several occasions in February 1959, Che Guevara visited Mr. Villoldo "with three to four cars with soldiers, surrounding [the] home and restraining the movement of [the] family."  [Doc. 33-15 at ¶ 23].  Upon entering the home, soldiers sexually assaulted Plaintiffs' mother and "threatened to kill [their] entire family by way of firing squad."  [*Id.*].  And in the days leading up to Mr. Villoldo's death, he and his family were "constant[ly]" harassed by government authorities at all hours of the day.  [Doc. 33-15 at ¶ 16; Doc. 33-13 at 49:3–9].  During that time, Mr. Villoldo was taken into custody on multiple occasions.  [Doc. 33-15 at ¶ 24].  While this harassment was ongoing, Mr. Villoldo was afraid that Gustavo and Alfredo "would be executed by the revolutionary government."  [Doc. 33-13 at 48:11–14].

On February 15, 1959, Che Guevara arrived at Mr. Villoldo's workplace and asked to speak with Mr. Villoldo; the two spoke for thirty minutes to an hour.  [Doc. 33-15 at ¶ 25; Doc. 33-13 at 50:1–18].  After Che Guevara left, Mr. Villoldo was in a "highly emotional" state.  [Doc. 33-13 at 50:16–18].  Mr. Villoldo took Gustavo for a walk later that evening and asked Gustavo to take care of his mother and brother.  [*Id.* at 50:1–9; Doc. 33-15 at ¶ 26].  In the early morning of February 16, 1959, Mr. Villoldo died by suicide.  [Doc. 33-15 at ¶ 26; Doc. 33-13 at 52:5–53:3;

Doc. 37-3 at 97:18–20].  Mr. Villoldo left a letter telling his family that he was forced to take his own life to protect his family.  [Doc. 33-13 at 53:4–15].  Gustavo later learned that Che Guevara had threatened to kill him, Alfredo, and their mother "unless [their] father forfeited all of his assets and took his own life."  [Doc. 33-15 at ¶ 27; Doc. 37-3 at 97:4–9].

In their Motion for Default Judgment, Plaintiffs provided no argument or supporting case law demonstrating that a suicide may be deemed an extrajudicial killing.  *See* [Doc. 33 at 17–19].  Thus, the Court ordered Plaintiffs to submit supplemental briefing expounding on their position.  [Doc. 36].  In their supplemental brief, Plaintiffs argue that the forced suicide of Mr. Villoldo amounts to an extrajudicial killing because even though Cuban officials did not take the ultimate action that caused Mr. Villoldo's death, his death was the result of a deliberate act on the part of Defendant that was reasonably foreseeable to produce the intended harm—i.e., Mr. Villoldo's death.  [Doc. 37 at 31–33].  They maintain that any ambiguity in the definition of "extrajudicial killing" must be construed in Plaintiffs' favor "to ensure that the FSIA serves its purpose of preventing 'state sponsors of terrorism . . . from escaping liability for their sins.'"  [*Id.* at 32 (quoting *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2022 WL 2817730, at *37 (D.D.C. July 19, 2022))].

As mentioned above, an extrajudicial killing is "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."  *Warmbier*, 356 F. Supp. 3d at 52.  This Court was unable to find any case law finding that an individual's suicide that followed governmental threats, coercion, or encouragement to commit suicide amounted to an extrajudicial killing under the TVPA or FSIA.  *But see Kar v. Islamic Republic of Iran*, No. CV 19-2070 (JDB), 2022 WL 4598671, at *15 n.14 (D.D.C. Sept. 30, 2022) (declining to "conclude that a suicide can *never* constitute an extrajudicial killing," and basing its

holding that there was no extrajudicial killing on a lack of evidence of defendants' intent to force the decedent to commit suicide) (emphasis added).  But the Court does not believe that the lack of analogous case law precludes a finding that there was an act of extrajudicial killing in this case with respect to Mr. Villoldo's death.

First, the Court concludes that there was an "act of extrajudicial killing."  To start, the Court considers the language of the statute.  The FSIA eliminates sovereign immunity for damages arising out of personal injury or death "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  Relevant here, the D.C. Circuit has advised that Congress's intent in amending the terrorism exception to the FSIA was to "prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins," *Kim*, 774 F.3d at 1048, and has further directed that, given the FSIA's "text and purpose," courts should "interpret its ambiguities flexibly and capaciously."  *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1168 (D.C. Cir. 2013).

As recently noted by the District Court for the District of Columbia, "[t]he FSIA does not waive immunity when a foreign state supports [or engages in] an extrajudicial killing, but rather an '*act of*' extrajudicial killing."  *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 169 (D.D.C. 2022) (quoting 28 U.S.C. § 1605A(a)(1) (emphasis added).  "The term 'act of' could be read multiple ways.  An 'act' could refer to 'a thing done' or a specific 'deed.'  But an 'act' might also refer to 'the process of doing' something."  *Id.* at 169–70 (citations and alteration marks omitted).  "Plausibly read, § 1605A(a)(1) could encompass (1) the specific deed of an extrajudicial killing or (2) *the process of committing* an extrajudicial killing."  *Id.* at 170 (emphasis added).  The *Roberts* court ultimately concluded that an "act of extrajudicial killing" included attempted

extrajudicial killings, even if the attempted killings did not result in death.  *Id.* at 170–71; *see also Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 459 (D.P.R. 2010) ("Congress specifically permitted actions for 'personal injury . . . that was caused by an *act* of . . . extrajudicial killing.'  Thus, section 1605A(a)(1) does not require that the injury to a plaintiff result from the actual 'extrajudicial killing,' but rather from an 'act of extrajudicial killing.'") (quoting 28 U.S.C. § 1605A(a)(1) (citations omitted) (emphasis in original)).  While not directly on point, the Court is persuaded by the analysis in *Roberts* with respect to the issue in this case— whether a foreign state's coercion or threats that are intended to induce a person to commit suicide and which do lead that person to commit suicide—may amount to an "act of extrajudicial killing" for purposes of the FSIA.

At least one court has concluded that the ultimate act causing a person's death need not have been undertaken by the defendant in order to conclude that the defendant committed an extrajudicial killing.  In *Kilburn v. Islamic Republic of Iran*, the decedent was sold by a government party to a Libyan terrorist organization "with the knowledge that he would be murdered."  699 F. Supp. 2d 136, 152 (D.D.C. 2010).  The court concluded that this amounted to an extrajudicial killing under the TVPA because the government "knew that [the decedent] would be killed because Libyan agents made it known that that was their purpose in purchasing a hostage."  *Id.*; *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 34 (D.D.C. 2012) (finding an extrajudicial killing where the defendants "instructed and encouraged members of [a terrorist organization] to carry out" a suicide bombing"); *cf. Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) (noting that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing").

The Court is persuaded by *Kilburn*; even though Defendant's agents may not have themselves killed Mr. Villoldo, they threatened Mr. Villoldo that if he did not kill himself, his family would be killed. This threat came after months of harassment targeting the Villoldo family and the imprisonment of Gustavo and Alfredo (including the torture of Gustavo), and was made in a time during which revolutionary agents were targeting individuals with ties to the United States and executing Cuban citizens and residents. With this evidence, Plaintiffs have demonstrated that "the victim's injury was 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's act," and Defendant's conduct was a "substantial factor" in Mr. Villoldo's death. *Warmbier*, 356 F. Supp. 3d at 52 (noting that jurisdictional causation is evaluated under a "proximate cause" standard and finding an extrajudicial killing where "the precise cause of the condition that caused [the decedent's] death [was] unknowable," but where there was "overwhelming evidence that North Korea's barbaric acts were a substantial factor in causing [the decedent's] death"). The Court concludes that Defendant's conduct amounts to an act of judicial killing in this instance.

Second, the evidence shows that Defendant's act was "deliberated." A deliberated killing is "one undertaken with careful consideration, not on a sudden impulse." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 83 (D.D.C. 2018). The element of deliberation "require[s] the defendant to act with the goal and expectation of killing, or at the very least, grievously physically wounding." *Kar*, 2022 WL 4598671, at *13 (quotation omitted). Here, the evidence demonstrates that Mr. Villoldo and his family were the targets of Che Guevara for months prior to Mr. Villoldo's death. *E.g.*, [Doc. 33-15 at ¶ 23]. And Mr. Robinson has opined that the Cuban government kidnapped, tortured, and forced the extrajudicial killings of Cuban residents with wealth and close ties to the United States. [Doc. 33-7 at ¶ 5]. This evidence demonstrates that Defendant's threats

were "undertaken with careful consideration" and were undertaken "with the goal and expectation of killing." *See Sotloff*, 525 F. Supp. 3d at 138 (concluding that killings were deliberated where they involved the defendant's "substantial preparation").

And finally, third, there is no evidence in the record that Defendant's actions were authorized by a judgment pronounced by a court of law. Because Plaintiffs have satisfied all three elements, the Court concludes that Defendant's actions resulting in the death of Mr. Villoldo amounted to an "act of extrajudicial killing" under the FSIA. *Roberts*, 581 F. Supp. 3d at 170.

Accordingly, the Court concludes that Plaintiffs have established that his claims, insofar as they seek damages for the extrajudicial killing of Mr. Villoldo, arise out of a specifically enumerated act precluding immunity under the FSIA.

## II.   Personal Jurisdiction and Proper Service

"Federal courts enforcing state court judgments must have jurisdiction over the relevant party." *Ellenoff Grossman & Schole LPP v. Tempus Applied Sols. Holdings, Inc*., No. 4:20-cv-68, 2020 WL 4926144, at *2 (E.D. Va. Aug. 21, 2020). "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under [28 U.S.C. § 1330(a)] where service has been made under [28 U.S.C. § 1608]." 28 U.S.C. § 1330(b). Plaintiffs assert that the Court has personal jurisdiction over Defendant because this is a non-jury civil action against a foreign state, Cuba is not entitled to immunity under § 1605A, and Cuba was properly served under § 1608(a)(4). [Doc. 33 at 16]. This Court's personal jurisdiction over Cuba turns on whether service in this case was procedurally proper.

### A.   Service Under the FSIA

Service on a foreign state is governed by 28 U.S.C. § 1608. Section 1608(a) sets forth four methods of serving process on a foreign state, in hierarchical order. *See* 28 U.S.C. § 1608(a);

*Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1054 (2019).  These methods "are to be followed in descending order of preference," i.e., "a plaintiff 'must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on.'"  *de Sousa v. Embassy of Republic of Angola*, 229 F. Supp. 3d 23, 26 (D.D.C. 2017) (quoting *Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012)).  The preferred method of service is through "any special arrangement for service between the plaintiff and the foreign state," 28 U.S.C. § 1608(a)(1), or, if no such arrangement exists, service may be undertaken in accordance with "an applicable international convention on service of judicial documents."  § 1608(a)(2).

If service cannot be accomplished using either of these methods, service on the foreign state may be made by sending the complaint and summons, along with linguistic translations thereof into the official language of the foreign state, using "any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."  § 1608(a)(3).  And lastly, if service cannot be made under subsection (3) within 30 days, service may be made

> by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court, to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

§ 1608(a)(4).

Because "Congress meant for section 1608(a) to establish a relative *hierarchy* of service methods," a plaintiff "may not opt to serve a foreign defendant out of order, i.e., by pursuing a *less* preferred method first, in contravention of the express language of the statute." *Azadeh v. Gov't of the Islamic Rep. of Iran*, 318 F. Supp. 3d 90, 100 (D.D.C. 2018) (emphasis in original).  "One

consequence of this rule is that even an otherwise successful attempt to serve a foreign state is invalid if conducted without following the statutorily prescribed order." *Przewozman v. Islamic Republic of Iran*, No. CV 19-2601 (RDM), --- F. Supp. 3d ----, 2022 WL 4355310, at *3 (D.D.C. Sept. 19, 2022). "[T]he rule of law demands adherence to strict requirements even when the equities of a particular case may seem to point in the opposite direction." *Harrison*, 139 S. Ct. at 1062.

### B.    Plaintiffs' Attempts at Service

On September 29, 2021, shortly after this case was initiated, Plaintiffs filed a "Motion for Leave to Provide Assistance to the Clerk of Court in the Service of the Complaint, Summons, and Notice of Suit" (the "Motion for Service"). [Doc. 8]. In their Motion for Service, Plaintiffs represented that there is no special arrangement for service or international convention for service between the United States and Cuba, and thus, service could be accomplished only through the methods described in 28 U.S.C. § 1608(a)(3) and (4). [*Id.* at 2 n.1]. They asserted that the only shipping agency that will deliver packages to Cuba from the United States with a signed return receipt is DHL, and further represented that DHL only accepts deliveries to Cuba through one office in the United States—located in Miami, Florida—and only accepts packages that are hand-delivered to that location. [*Id.* at ¶¶ 4–5]. Furthermore, Plaintiffs stated that DHL has a practice of examining the contents of any packages routed to Cuba to determine whether the contents violate federal regulations on deliveries to Cuba, [*id.* at ¶ 6], and that DHL, after inspecting the package, generates a shopping label for the shipment and seals the package. [*Id.* at ¶ 7].

Due to these circumstances, Plaintiffs' counsel spoke with personnel in the Clerk's Office of this District and offered that he could transfer service documents from the Clerk's Office to his office in Miami via FedEx, and then bring the documents to DHL's Miami location to be mailed

to Cuba.  [*Id.* at ¶ 11].  The Clerk's Office advised counsel that it was unable to commit to this arrangement because it is required to seal the service package for final delivery and address a prepaid shipping label itself.  [*Id.* at ¶ 12].  Plaintiffs represented in their Motion that because DHL inspects the contents of all packages before they are shipped and generates package labels itself, Plaintiffs' counsel could not "provide the Clerk with the means to seal the service package in a final DHL shipping envelope and address the exact physical label that [would] be placed on the package," but could provide the Clerk's Office "with the DHL shipping forms and a FedEx envelope to seal and send to Plaintiffs' counsel in Miami," which could be opened in the presence of a DHL employee at the Miami office.  [*Id.* at ¶¶ 13–14].

> Due to these circumstances, Plaintiffs requested a court order
>
> authorizing the Plaintiffs to assist the Clerk in the mailing of the service package by permitting Plaintiffs' counsel to transfer the approved service package from the Clerk's office to Plaintiffs' counsel's office in Miami, Florida via FedEx, whereupon the sealed FedEx package will be taken to the DHL location in Miami, Florida, where it will be provided to and opened in the presence of DHL employees for their inspection and then shipping to the Defendant.

[*Id.* at ¶ 16].  In the alternative, Plaintiffs requested a court order determining that service cannot be made under 28 U.S.C. § 1608(a)(3) and authorizing Plaintiffs to serve Defendant via 28 U.S.C. § 1608(a)(4).  [*Id.* at ¶ 17].

Judge Neureiter granted the Motion for Service in part.  He first found that "[d]ue to the lack of availability within this District of a mailing service that can deliver mail to addresses within Cuba with a signed receipt upon delivery, . . . service under 28 U.S.C. § 1608(a)(3) of the FSIA cannot be made within thirty days."  [Doc. 11 at 3].  Judge Neureiter authorized Plaintiffs to proceed with serving Defendant pursuant to 28 U.S.C. § 1608(a)(4).  [*Id.*].  Judge Neureiter ordered Plaintiffs to provide the Clerk of Court with copies of the Complaint, summons, and notice of suit, with corresponding Spanish translations, and a prepaid FedEx envelope to be addressed and

dispatched to the United States Secretary of State in Washington, D.C.  [*Id.*].  Judge Neureiter ordered the Clerk of Court to file a notice on the docket reflecting dispatch to the Secretary of State once the documents had been sent.  [*Id.*].  The Clerk of Court did so on January 21, 2022.  [Doc. 28].

On May 20, 2022, the Clerk of Court received a letter from the Department of State.  *See* [Doc. 30].  The letter indicated that "[b]ecause the United States Embassy operations in Cuba are currently limited, the [service] documents were delivered to the Embassy of Cuba in Washington, DC under cover of U.S. Department of State diplomatic notice" on April 28, 2022.  [*Id.* at 1].

### C.   Whether Defendant Was Properly Served in This Case

Plaintiffs maintain that this Court has personal jurisdiction over Defendant because it "was properly served in accordance with 28 U.S.C. § 1608(a)(4)."  [Doc. 33 at 16].  But as explained above, "even an otherwise successful attempt to serve a foreign state is invalid if conducted without following the statutorily prescribed order."  *Przewozman*, 2022 WL 4355310, at *3.  Thus, service under § 1608(a)(4) will be deemed acceptable only if Plaintiffs attempted service through the preceding three methods, or properly determined that those methods were unavailable.  *de Sousa*, 229 F. Supp. 3d at 26.

The Court is satisfied that the first two methods of service were unavailable to Plaintiffs, as Plaintiffs represent that there is there is no special arrangement for service between Cuba and Plaintiffs, and furthermore, Cuba has not entered into any international convention for service with the United States.  [Doc. 8 at 2 n.1].  Furthermore, the Court construes Judge Neureiter's October 6, 2021 order as deeming the third method of service unavailable to Plaintiffs.  *See* [Doc. 11 at 3 ("Due to the lack of availability within this District of a mailing service that can deliver mail to addresses within Cuba with a signed receipt upon delivery, the Court finds that service under 28

U.S.C. § 1608(a)(3) of the FSIA cannot be made within thirty days.  Accordingly, the Plaintiffs

may proceed to carryout service on Defendant Cuba with the assistance of the Clerk of Court under

28 U.S.C. § 1608(a)(4).")].  For this reason, Plaintiffs' service under § 1608(a)(4) was procedurally

proper, and this Court thus has jurisdiction over Defendant to enforce the state-court judgment.

*Ellenoff*, 2020 WL 4926144, at *3.

### III.   Plaintiffs' Claim for Relief

"Though the Court's exercise of jurisdiction over [at least a portion of] the instant case is

proper, an examination of the scope of relief sought is still required."  *Id.*  Plaintiffs assert one

claim under the Full Faith and Credit Clause,[12] seeking "recognition and enforcement" of the

Florida state-court judgment.  [Doc. 1 at ¶ 15].  And in their Motion for Default Judgment, they

request that the Court "enter a final judgment confirming subject matter jurisdiction and granting

full faith and credit to the Florida state court's Corrected Second Amended Final Judgment."  [Doc.

33 at 3].  They also request

> entry of a default judgment in substantially the same form as the proposed order in
> the total amount of $4,351,031,753, consisting of: (i) the principal amount of
> $2,790,000,000 awarded in the Corrected Second Amended Final Judgment
> rendered in Plaintiffs' favor against Defendant by the Circuit Court of the Eleventh
> Judicial Circuit in and for Miami-Dade County, Florida on May 25, 2021, *nunc pro
> tunc* to August 19, 2011; and (ii) interest at the statutory rates established pursuant
> to FLA STAT. § 55.03 (2022), from August 19, 2011 through June 28, 2022 in the
> amount of $1,561,031,753.  Plaintiffs also respectfully request the entry of post-
> judgment interest, in accordance with 28 U.S.C. § 1961.

[*Id.* at 19].  The Court identifies two issues in Plaintiffs' requested relief.

***First***, in their Motion for Default Judgment, Plaintiffs do not cite to any supporting legal

authority establishing that their requested relief—entry of a new federal judgment—is legally

permissible.  *See generally* [*id.*].  "Since 1948, federal courts have been directed by 28 U.S.C.

---

[12] *See supra* n.4.

§ 1738 to accord state court judgments full faith and credit." *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 122 (2d Cir. 2017). "Section 1738 does not, however, provide guidance as to how state court judgments may be enforced in federal court." *Id.* Generally speaking, "federal courts generally require that a civil action be filed, with notice to the judgment creditor, before enforcing a state court judgment." *Id.*; *see also* 50 C.J.S. Judgments § 1336 ("A judgment of a state court may be sued on as a cause of action in a federal court having jurisdiction."); *Caruso v. Perlow*, 440 F. Supp. 2d 117, 119 (D. Conn. 2006) ("[T]he holder of a state-court judgment seeking to have it enforced in federal court must fall back upon the traditional, if rather cumbersome, strategy of bringing a civil action on the state-court judgment by invoking, for example, the diversity jurisdiction of the federal court.").

"Unlike state courts that have domestication procedures, there is no procedure in the federal courts for the recognition or confirmation of state court judgments." *Cont'l Cas. Co. v. Argentine Republic*, 893 F. Supp. 2d 747, 753 (E.D. Va. 2012); *compare* 28 U.S.C. § 1963 (permitting federal courts to register other federal court judgments); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 945 F.3d 1270, 1274 (10th Cir. 2019) (holding that § 1963 "applies only to registration of federal-court judgments in federal courts—not to state-court judgments."). "[T]he proper treatment of a state court judgment by a federal court is not recognition, . . . but enforcement." *Cont'l Cas. Co.*, 893 F. Supp. 2d at 753; *see also* Wright & Miller et al., 18B Fed. Prac. & Proc. § 4469 (3d ed. 2022) ("The most direct consequence of applying the full faith and credit statute is that a federal court must enforce a state court judgment when an action is brought for that purpose."); [Doc. 1 at ¶ 1 (Plaintiffs seeking "the recognition, confirmation, and enforcement of" the state-court judgment)].

For this reason, "the Court cannot enter its own judgment against [the defendant], upset the terms of the judgment issued by the [state] court, or register the judgment in the [state] lawsuit as a federal judgment." *Ellenoff*, 2020 WL 4926144, at *3; *see also W.S. Frey Co. v. Precipitation Assocs. of Am., Inc.*, 899 F. Supp. 1527, 1528 (W.D. Va. 1995) ("[G]iving a state's judgment full faith and credit, that is, preclusive effect in any proceeding before the court, is a far cry from making a judgment of a state court a federal judgment.").   Rather, "the relief available in [this] lawsuit is limited to enforcement of the state court judgment as provided by the law of the issuing state." *Ellenoff*, 2020 WL 4926144, at *3; *cf. W.S. Frey*, 899 F. Supp. at 1528 (explaining why registration of a state-court judgment, which would effectively turn the state-court judgment into a federal-court judgment, is procedurally improper); Restatement (Second) of Judgments § 18 cmt. f (1982) (explaining that after a plaintiff receives a favorable judgment, the plaintiff "cannot thereafter maintain an action on the original claim or any part thereof," but "may be able to maintain an action upon the judgment"); *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, No. 19-cv-46-FYP-RMM, 2022 WL 17370242, at *18 n.8 (D.D.C. Aug. 3, 2022) (noting that the Restatement of Judgments "does not use the word 'judgment' to refer to the enforcing [court's] action.")

In light of this authority, the Court concludes that it cannot provide the entirety of the relief Plaintiffs seek.   Insofar as Plaintiffs' Motion requests an order "confirming subject matter jurisdiction and granting full faith and credit to the Florida state court's [judgment]," [Doc. 33 at 3], this request appears to be within the Court's authority.   However, to the extent that the Motion seeks the entry of a new federal judgment, [*id.* at 19], the Court cannot grant that relief.   Instead,

the state-court judgment may only be *enforced* in this District.  *See Ellenoff*, 2020 WL 4926144, at *3.[13]

**Second**, the Court has independently concluded that while the Florida court had subject matter jurisdiction over Alfredo's claims insofar as they are based on the extrajudicial killing of his father, Plaintiffs have not provided sufficient evidence that the Florida court had subject matter jurisdiction over Alfredo's claims to the extent they were based on any acts of torture committed against him.  "[I]f § 1605A(a) does not waive [a sovereign's] immunity as to any portion of [a] plaintiff['s] claims, then the Court has no power to award damages for that portion."  *Kar*, 2022 WL 4598671, at *16.

It is presently unclear whether the Court can grant full faith and credit to the Florida court's judgment, which does not specifically delineate which damages were awarded to Alfredo for the alleged acts of torture against him and which damages were awarded for the extrajudicial killing of Mr. Villoldo.  [Doc. 33-2 at 29 (entering judgment in favor of Alfredo "for the sum of $195,000,000, representing damages for solatium, pain and suffering, and emotional distress.")].  Given that the Florida court expressly concluded that Cuba's waiver of sovereign immunity was

---

[13] Similarly, Plaintiffs "request the entry of post-judgment interest, in accordance with 28 U.S.C. § 1961."  [Doc. 33 at 19].  This request is unaccompanied by legal argument or supporting authority and is thus not adequately presented to the Court.  [*Id.*]; *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed.").  Section 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered *in a district court*."  28 U.S.C. § 1961(a) (emphasis added).  But as explained above, this Court cannot enter a new federal judgment or alter the state-court judgment; it can only *enforce* the state-court judgment. *Ellenoff*, 2020 WL 4926144, at *3; *see also Valores Mundiales*, 2022 WL 17370242, at *11 (in case addressing enforcement of an award entered under the International Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which is to be enforced in the same manner as a state-court judgment, and explaining that "§ 1961's mandatory post-judgment interest rate for *federal* judgments" would not apply to a *state*-court judgment).  Plaintiffs have not established that they are entitled to post-judgment interest under § 1961.

based on "the *torture* inflicted by the Defendants [that] began in January 1959 with the imprisonment and physical torture of the Villoldos," [*id.* at 25 (emphasis added)]; *see also* [*id.* at 27 (concluding that the Florida court has subject matter jurisdiction "over this case" and "over this Action," but not addressing Plaintiffs' individual claims)],[14] it appears that the Florida state-court judgment ties a portion of the damages awarded to Alfredo to the alleged "acts of torture," which this Court has concluded is insufficient to establish a waiver of sovereign immunity with respect to Alfredo.  It thus appears that a portion of the Florida court's judgment is likely void.  *See Armand v. Amisy*, 316 So. 3d 740, 742 (Fla. Dist. Ct. App. 2021) ("A judgment entered by a court which lacks subject matter jurisdiction is void.").  Nor is it clear to this Court what causes of action are associated with the different awards of damages in the Florida state-court judgment.  *See generally* Doc. 33-2].[15]

Despite this Court's exhaustive independent research, the Court could not locate applicable authority directing the Court how to proceed in this instance.  Accordingly, the Court will **GRANT** the Motion for Default Judgment insofar as it requests that the Court "confirm[] subject matter jurisdiction" over Gustavo's claims, both individually and as executor of Mr. Villoldo's estate, and Alfredo's claims, to the extent they are based on the extrajudicial killing of Mr. Villoldo.  *See* [Doc. 33 at 3].  However, the Court will **DENY** the Motion for Default Judgment to the extent it requests that the Court "confirm[] subject matter jurisdiction" over Alfredo's claims based on acts

---

[14] *See La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 477 F. Supp. 2d 131, 137–38 (D.D.C. 2007) (explaining that the FSIA provides for waiver of specific *claims*, as opposed to entire *cases*).

[15] It is unclear which claims Plaintiffs asserted in the state-court case.  The judgment states that "Plaintiffs bring claims against Defendants for intentional infliction of emotional distress for the wrongful death of their father pursuant to the terroris[m] exception to the [FSIA], for the consequences of the same and for the acts of terrorism as more fully established below," [Doc. 33-2 at 3], but does not specifically identify the claims asserted by Plaintiffs.  As mentioned above, Plaintiffs have not submitted a copy of their state-court complaint in this action.

of torture or "grant[] full faith and credit to the Florida state court's Corrected Second Amended Final Judgment." [*Id.*].  Plaintiffs are **GRANTED LEAVE** to file a supplemental motion for default judgment that specifically addresses, with supporting legal authority, the proper course of action for the Court to take in light of the Court's above conclusions.[16]  In addition, the Motion is **DENIED** insofar as it requests that this Court enter a new judgment or requests the entry of post-judgment interest under § 1961.

**CONCLUSION**

For the reasons stated herein, it is **ORDERED** that:

(1)    Plaintiffs' Motion for Entry of Default Judgment [Doc. 33] is **GRANTED in part** and **DENIED in part**;

(2)    The Motion is **GRANTED** to the extent it seeks confirmation of subject matter jurisdiction over Gustavo's claims, both individually and as executor of Mr. Villoldo's estate, and Alfredo's claims, to the extent they are based on the extrajudicial killing of Mr. Villoldo;

(3)    The Motion is **DENIED** in all other respects; and

(4)    Plaintiffs are **GRANTED LEAVE** to file a supplemental motion for default judgment specifically addressing the issues identified in this Memorandum Opinion and Order.

DATED:  March 7, 2023                          BY THE COURT:

_____
Nina Y. Wang
United States District Judge

---

[16] Should Plaintiffs elect to file a renewed motion for default judgment, Plaintiffs need not reiterate their arguments with respect to the waiver of immunity under the FSIA.